**GAF CORPORATION, Appellant,**

v.

**CIRCLE FLOOR CO., INC., et al.,
Appellees.**

**No. 668, Docket 71–1956.**

United States Court of Appeals,
Second Circuit.

Argued April 19, 1972.

Decided July 5, 1972.

Terence H. Benbow, New York City (Edwin J. Wesely and Steven A. Berger, Winthrop, Stimson, Putnam & Roberts, New York City, on the brief), for appellant.

Charles G. Moerdler, New York City (Stephen A. Block and Robert P. Stein, Stroock, Stroock & Lavan, New York

City, on the brief), for appellees Paul Milstein, Morris Milstein, Seymour Milstein, and Gloria Milstein Flanzer.

Robert S. Smith, New York · City (Martin London, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, on the brief), for appellee Circle Floor Co., Inc.

Before WATERMAN, HAYS and FEINBERG, Circuit Judges.

HAYS, Circuit Judge:

Appellant GAF Corporation filed a complaint in the United States District Court for the Southern District of New York alleging that four individuals and Circle Floor Company conspired to restrain and attempted to monopolize interstate commerce, in violation of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (1970), by seeking to gain working control of GAF through stock acquisitions and proxy solicitations. A violation of § 7 of the Clayton Act, 15 U.S.C. § 18 (1970), was also alleged. The individual defendants and Circle Floor moved separately for dismissal of the complaint for failure to state claims on which relief could be granted and for summary judgment. These motions were granted in two orders, D.C., 329 F.Supp. 823, from which GAF now appeals. We affirm the dismissal of the complaint on the ground that GAF has failed to allege damages resulting from the alleged violations of the antitrust laws that are compensable under § 4 of the Clayton Act, 15 U.S.C. § 15 (1970).

## I.

In order to understand more clearly the exact nature of the alleged antitrust violations set forth in the complaint, it is necessary to describe in some detail the parties to this action and their relationships with each other.

GAF Corporation is a large, diversified publicly-held corporation which manufactures, among other things, floor tile. GAF sells the floor tile it manufactures to "national accounts," distributors of building materials, and contractors who install finished floors in buildings. GAF alleges that, for purposes of this antitrust suit, the relevant product markets are the manufacture and contract installation of floor tile, and the relevant geographic market is the New York City metropolitan area. GAF alleges that it is the largest manufacturer of floor tile in the New York area, and that the floor tile manufacturing market is "highly concentrated" with seven companies manufacturing over 90% of the total production of floor tile in the New York area. GAF alleges that the seven largest manufacturers sell 49.5% of the floor tile produced to contractors, and the six largest contractors purchase 34.-165% of the floor tile produced by the seven largest manufacturers, and that this amounts to two-thirds of the floor tile purchased by all contractors in the New York area. GAF alleges that it sells 28% of the total amount of floor tile sold to the six major New York area contractors.

Until July, 1968, the stock of Circle Floor Company was held almost entirely by the Milsteins, the individual defendants named in the complaint. At that time Circle Floor was acquired by Kinney National Services, Inc. Circle Floor is engaged "in the business of contracting or subcontracting to install finished floors (mainly floor tile) primarily in buildings being constructed in the New York" area. GAF alleges that Circle Floor is the largest contract installer of floor tile in the New York area; in 1970 Circle Floor allegedly purchased 28% of the floor tile purchased by "major contractors" in the New York area, and over 50% of Circle Floor's purchases of floor tile was from GAF. In sum, GAF alleges that it and Circle Floor stand in a verticle supplier-customer relationship, with GAF the largest supplier and Circle Floor the largest contract purchaser of floor tile in the relevant geographic market.

Appellee Paul Milstein is president of Circle Floor, and, after the acquisition of Circle Floor by Kinney, he was elected to the Kinney board of directors. Morris Milstein, father of Paul, is chair-

man of the board of Circle Floor. Paul Milstein owns 95,272 shares of GAF's $1.20 convertible preferred stock and 103,650 shares of GAF common stock. Morris Milstein owns 38,642 shares of GAF $1.20 convertible preferred. It is not alleged that the two other individual defendants, Seymour Milstein and Gloria Milstein Flanzer, brother and sister of Paul Milstein, had any direct relationship with Circle Floor or Kinney, but GAF alleges that they own, respectively, 94,750 shares of GAF convertible preferred and 105,650 shares of GAF common stock, and 95,682 shares of GAF convertible preferred. Thus the Milstein family owns a substantial portion of the outstanding stock of GAF, but, although Paul and Morris Milstein are members of the five-man board of directors of Circle Floor, the Milstein family owns no shares of Circle Floor and less than ½ of 1% of the outstanding stock of Kinney, the company that owns Circle Floor. When the complaint was filed, Circle Floor owned 420 shares of GAF convertible preferred.

The substance of GAF's charge of antitrust violation is that Circle Floor and the Milsteins sought to acquire working control of GAF in order to be in a position to establish a vertically integrated corporation that would have competitive advantages over other manufacturers and contract installers of floor tile, thus unreasonably restraining trade in violation of the Sherman and Clayton Acts.

In May, 1970 Paul Milstein commenced a derivative action against the directors of GAF charging waste. In December, GAF commenced an action against the Milsteins alleging violations of the Williams Act, 15 U.S.C. § 78m(d) (1970), and Rule 10b–5, 17 C.F.R. 240.-10b–5 (1972). In January, 1971, the Milsteins announced the formation of the GAF Stockholders Protective Committee the purpose of which, according to the complaint, was "the solicitation of proxies [to be voted at the GAF annual stockholders meeting scheduled for April] to replace the incumbent Board of Directors of GAF and thus acquire control of the corporation. . . ." In February, GAF commenced the instant action, which included in the prayer for relief a request for an injunction prohibiting the Milsteins from soliciting or voting proxies. In March, the Milsteins commenced an action against the president and chairman of the board of directors of GAF alleging violations of § 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a) (1970) and rules promulgated thereunder. In May, 1971 it was announced that the management had defeated the challengers in the proxy fight.

## II.

The complaint attempts to set forth violations of §§ 1 and 2 of the Sherman Act and § 7 of the Clayton Act. The essence of all three of the alleged violations—whether premised on a § 1 conspiracy allegation, a § 2 attempt allegation, or a § 7 indirect acquisition allegation—is that Circle Floor and the Milsteins sought "to acquire control of GAF which, if successful, would allow defendants, through their common control of Circle Floor and GAF, to monopolize the [floor tile installing and manufacturing markets]." The result of such control, the complaint alleges, would be the "elimination of GAF as a source of supply to major contractors, other than Circle Floor" thus giving Circle Floor "decisive competitive advantages over other major contractors . . . since Circle Floor would have access to an almost unlimited source of supply of floor tile at whatever price it wanted to pay. . . ." In addition, such acquisition of control of the largest manufacturer of floor tile by the largest purchaser would, the complaint alleges, raise barriers to entry into both the floor tile manufacturing and contract installation businesses.

The facts alleged in the complaint to support the charges of conspiracy to restrain trade through vertical integration, attempted monopolization, and restraint of trade by the indirect acquisition of shares of GAF by Circle Floor

fall into two basic categories. First, plaintiff alleges that the defendants sought to depress the market price of GAF stock in order to be able to increase their voting strength by purchasing additional shares and thus to acquire control of GAF, their ultimate objective being the verticle integration of the two companies. The complaint alleges that Circle Floor cut its purchases of floor tile from GAF in 1968, 1969, and 1970 in order to inflict "economic injury upon GAF and [to embarrass] the management of GAF." In addition, the complaint alleges that the defendants sought "to disparage unfairly the management of GAF" so as to depress the value of GAF stock, and that one of the devices to accomplish this result was the derivative action commenced by Paul Milstein in May, 1970. The second category of factual allegations deals with the defendants' efforts to obtain additional voting strength in order to oust the incumbent management of GAF. Plaintiff alleges that the defendants purchased additional shares of GAF through nominees "without publicly disclosing such increase as required by law;" that defendants failed to file on time an accurate Schedule 13D; and that defendants formed the GAF Stockholders Protective Committee to solicit proxies.

### III.

Circle Floor moved to dismiss the complaint and for summary judgment. On April 1, 1971 the district court (Cooper, J.) ruled that, because of the allegations "that Circle participated in an unlawful conspiracy . . . aimed at enhancing the likelihood of success of the allegedly projected Milstein takeover," and the allegation of "an intentional reduction of purchases by Circle of GAF goods in 1968–70," issues of fact existed which precluded summary judgment. Later, the Milsteins moved for dismissal of the complaint and for summary judgment. After the motions were made but before they were decided, the GAF shareholder meeting was held and the management victory in the proxy contest was announced. The district court (Metzner, J.) held that the result of the proxy contest "obviate[d] any basis for injunctive relief," that the § 7 claim was insufficient, and that although the §§ 1 and 2 claims were sufficient to withstand a motion to dismiss, summary judgment was warranted with respect to Circle Floor's "refusal to deal" with GAF because it was not shown that the withdrawal of business was in furtherance of a takeover conspiracy. Circle Floor, claiming that the result of the proxy contest changed the factual situation of the suit, again moved for dismissal of the complaint and for summary judgment. The district court (Gurfein, J.) dismissed the complaint on the ground that the "alleged" refusal by Circle Floor to deal with GAF did not amount to a restraint of trade under § 1, that the § 2 claim against Circle Floor was insufficient because of "the passive role ascribed to Circle" in the complaint, and that the § 7 claim against Circle Floor was insufficient because the alleged indirect acquisition by Circle Floor of GAF shares had no detrimental impact on competition in the relevant market since the effort to obtain control of GAF was defeated. GAF now appeals the orders granting summary judgment and dismissing the complaint as to both the individual defendants and Circle Floor, contending that it has suffered monetary damages due to Circle Floor's "partial boycott" and that genuine issues of fact with respect to the conspiracy to restrain trade and attempt to monopolize preclude summary judgment.

### IV.

■ The monetary damages that GAF alleges it has sustained as a consequence of appellees' conduct are $730,000 in "lost profits" resulting from Circle Floor's "partial withdrawal" of purchases of floor tile from GAF during the period 1968–1970, and the expenses of conducting the proxy fight to prevent the threatened takeover by the Milsteins.

Although at first glance it appears that GAF has been "injured . . . by reason of" violations of the antitrust laws, a closer examination of the alleged violations reveals that the damages GAF claims to have suffered did not result from the anti-competitive impact of appellees' "activities." Since we base our decision affirming the dismissal of the complaint on the ground that GAF has failed to allege antitrust damages, we need not consider the aspects of the sufficiency of the complaint which were passed upon by the three district court judges.

The basic contention of GAF's complaint—whether framed in terms of a § 1 conspiracy, a § 2 attempt, or a § 7 indirect acquisition in restraint of trade —is that the Milsteins and Circle Floor sought to obtain control of GAF, the major manufacturer of floor tile in the relevant geographic market. The anticompetitive effect of the "conspiracy" or "attempt" would be, the complaint alleges, a lessening of competition in the floor tile installation market, in that the "major [floor tile] contractors, other than Circle Floor" would not have GAF as a source of supply, thus giving Circle Floor "decisive competitive advantages over other major contractors." In addition, the complaint alleges that "[a]ctual and potential manufacturers and major contractors of floor tile," in other words, potential competitors of GAF and Circle Floor, "may be discouraged or prevented from entering the . . . floor tile market." GAF claims that the partial withdrawal of business by Circle Floor, at the instance of Paul and Morris Milstein, was "in furtherance of the combination and conspiracy and attempt to acquire control of GAF by inflicting economic injury upon GAF and embarrassing the management of GAF," thus depressing the market price of GAF stock and enabling the Milsteins to purchase sufficient additional shares to acquire control of GAF. Thus the anti-competitive effects of the antitrust violations alleged by GAF would not be felt by GAF but by competitors of GAF and Circle Floor, and the only monetary damages set forth in the complaint do not represent the monetary equivalent of *anticompetitive* harm caused by the alleged plan of verticle integration.

## A. Antitrust Damages

█ Assuming that GAF could establish that the partial withdrawal of business by Circle Floor resulted in some lost profits, that loss, and the expenses of conducting the proxy contest, would not be the result of diminution in competition produced by the substantive violations of the Sherman and Clayton Acts alleged in the complaint. GAF does not allege facts sufficient to state a claim for relief under the antitrust laws for damage to *its* business by reason of a restraint of trade. GAF is in effect contending that because appellees' alleged activities threatened the competitive position of others, it can maintain a suit under § 4 of the Clayton Act, 15 U. S.C. § 15 (1970), merely by alleging some loss. But this is not the law. Even assuming that GAF has suffered some damage, GAF has not, within the meaning of § 4, been "injured . . . by reason of" the alleged violations of the antitrust laws set forth in the complaint.

The Supreme Court has consistently reiterated that "[t]he Sherman Act was . . . aimed at preserving free and unfettered *competition* as the rule of trade," and that "the policy unequivocally laid down by the Act is competition." Northern Pac. Ry. v. United States, 356 U.S. 1, 4, 78 S.Ct. 514, 517, 2 L.Ed.2d 545 (1958) (emphasis added). The courts, in interpreting § 4 of the Clayton Act and its predecessor, have endeavored, although with some inconsistency and conflict, to promote the policy of competition established by the Sherman and Clayton Acts by interpreting § 4 as allowing treble damages only to those who have suffered some diminution of their ability to compete. Whether viewed in terms of "lack of standing" or the absence of *antitrust* damages, the courts, in denying recovery to various

kinds of plaintiffs, have sought to confine recovery to those who have been injured by restraints on competitive forces in the economy.

Not all persons who may be able to trace an economic loss to a violation of the antitrust laws can recover under those laws. The Supreme Court has stated that, in determining who may sue under § 4, the central question is one of *competitive* injury. In Apex Hosiery Co. v. Leader, 310 U.S. 469, 492–493, 60 S.Ct. 982, 992, 84 L.Ed. 1311 (1940), the Court said that the Sherman Act

> "was enacted in the era of 'trusts' and 'combinations' of businesses and of capital organized and directed to control of the market by *suppression of competition* in the marketing of goods and services . . . . The end sought was the prevention of restraints *to free competition* in business and commercial transactions which tended to restrict production, raise prices or otherwise control the market . . . ." (Emphasis added).

Similarly, in Perkins v. Standard Oil Co., 395 U.S. 642, 89 S.Ct. 1871, 23 L. Ed.2d 599 (1969), in which the plaintiff sought treble damages for losses due to defendant's discriminatory pricing, the Supreme Court stressed that the plaintiff was suing for damages to his competitive position.

> "From [plaintiff's] point of view, the *competitive* harm done him by [defendant] is certainly no less because of the presence of an additional link in this particular distribution chain from the producer to the retailer. Here [defendant] discriminated in price between [plaintiff] and [a distributor], and there was evidence from which the jury could conclude that [plaintiff] was harmed *competitively* when [the distributor's] price advantage was passed on to [plaintiff's] retail *competitor* . . . .
>
>      \*    \*    \*    \*    \*    \*
>
> . . . It is clear in this case, however, that [plaintiff] was no mere innocent bystander; he was the principal victim of the price discrimination practiced by [defendant]. [H]e was *directly* injured . . . . "

Id. at 648, 649, 89 S.Ct. at 1874 (emphasis added).

This court has emphasized that, to recover, the plaintiff must allege and prove that the illegal restraint of trade injured his *competitive position* in the business in which he is or was engaged. See, e. g., United Copper Securities Co. v. Amalgamated Copper Co., 232 F. 574, 577 (2d Cir. 1916); Westmoreland Asbestos Co. v. Johns-Manville Corp., 30 F.Supp. 389, 391 (S.D.N.Y.1939), aff'd, 113 F.2d 114 (2d Cir. 1940); Monticello Tobacco Co. v. American Tobacco Co., 197 F.2d 629, 632 (2d Cir.), cert. denied, 344 U.S. 875, 73 S.Ct. 168, 97 L.Ed. 678 (1952); Productive Inventions, Inc. v. Trico Prods. Corp., 224 F.2d 678, 679 (2d Cir. 1955), cert. denied, 350 U.S. 936, 76 S.Ct. 301, 100 L.Ed. 818 (1956); SCM Corp. v. Radio Corp. of America, 407 F.2d 166, 171 (2d Cir.), cert. denied, 395 U.S. 943, 89 S.Ct. 2014, 23 L.Ed.2d 461 (1969); Billy Baxter, Inc. v. Coca-Cola Co., 431 F.2d 183, 187 (2d Cir. 1970), cert. denied, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971) ("Consequently, a plaintiff must allege a causative link to his injury which is 'direct' rather than 'incidental' or which indicates that his business or property was in the 'target area' of the defendant's illegal act . . . . These terms do not provide talismanic guides to decision, but they do indicate *the need to examine the form of violation alleged and the nature of its effect on a plaintiff's own business activities.*") (Emphasis added); Fields Productions, Inc. v. United Artists Corp., 318 F.Supp. 87, 88 (S.D.N.Y.1969), aff'd, 432 F.2d 1010 (2d Cir. 1970), cert. denied, 401 U.S. 949, 91 S.Ct. 932, 28 L.Ed.2d 232 (1971); Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc., 454 F.2d 1292, 1295–1297 (2d Cir. 1971), cert. denied 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972). The general proposition underlying cases such as

these is that only a person whose competitive business position was harmed by the *anticompetitive* effects of the alleged restraint of trade can maintain a treble damage action.

We hold that GAF has not been "injured . . . by reason of" the violations of the antitrust laws alleged in the complaint because the alleged damages are not the economic result of the *anticompetitive* effects of those alleged violations. GAF has not alleged that its position in the floor tile market has or would be affected by the conspiracy and attempt to control GAF. The complaint merely alleges, under three different theories, a plan for the vertical integration of GAF and Circle Floor that would amount to an unreasonable restraint of trade. The anticompetitive effects of such a restraint would be felt not by GAF but by the competitors of GAF and Circle Floor. The damages alleged by GAF do not represent the diminution of GAF's competitive position; the anticompetitive acts alleged in the complaint have not lessened GAF's ability to compete, and GAF has not therefore alleged that it has suffered any *antitrust* damages. Thus, whether GAF is viewed as not having "standing to sue" for these alleged violations of the antitrust laws, or, is viewed as not having sustained anticompetitive damages from the particular acts alleged, the result under § 4 is the same, and the dismissal of the complaint for failure to state a claim upon which relief can be granted was correct.

### B. Refusal to Deal

Two of the three district courts that have considered the sufficiency of the instant complaint have ruled that the allegations of a partial withdrawal of business by Circle Floor states a claim for relief under § 1 of the Sherman Act; the third held that no unreasonable restraint of trade was shown to have resulted from the "refusal to deal." An analysis of the complaint demonstrates, however, that not only is no concerted refusal to purchase from GAF alleged as a substantive antitrust violation, but the complaint does not allege sufficient facts to establish that GAF has been damaged. GAF alleges only that "Circle Floor's purchases of floor tile from GAF [declined] during the years 1968, 1969 and 1970 by more than 33%, 71% and 39%, respectively, from the volume purchased during the year 1967." GAF alleges that the $730,000 in "lost profits" was "based upon the difference between what [the profits on] GAF's sales *to Circle Floor* normally would have been in" those years. GAF does not allege that it was unable to sell floor tile, only that it could not sell the "normal" amount to Circle Floor; there is no factual allegation that GAF had been injured in its business due to a decrease in *total* sales. We fail to perceive how GAF could have lost any profits if customers purchased the same quantity in one year as in a previous year, although the identity of the purchasers changed. Nor does the complaint set forth facts from which damage to GAF could be inferred. GAF does not allege facts tending to establish that, during the period 1968–1970, the total supply of floor tile increased or the total demand decreased; it is difficult to understand how GAF could have lost any sales from Circle Floor's decreased volume of purchases.

Thus, not only does the complaint not allege that Circle Floor's "partial withdrawal" of business was an independent substantive violation of § 1, it also fails to allege sufficient facts to establish that GAF was actually injured in any way by the decrease in Circle Floor's purchases of floor tile.

The orders dismissing the complaint are affirmed.

WATERMAN, Circuit Judge, concurring:

I concur in affirming the lower court orders dismissing the complaint. I wish to emphasize that I do so on the specific ground that, taking all that is alleged in the complaint to be true, plaintiff-appel-

lant has failed to allege that it has suffered antitrust damages.

Though I concur in our affirmance I wish to make it clear that I have grave reservations about those conclusions of the learned judge below set forth in GAF Corporation v. Circle Floor Co., 329 F.Supp. 823, 827–829 (S.D.N.Y. 1971) which relate to the nature and requirements of a claim arising under Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2.

Moreover, I underscore the statement by Judge Hays that, in reaching the result we reach, we have not been required to "consider the aspects of the sufficiency of the complaint which were passed upon by the three district court judges."