442 U.S. 330 (1979)
REITER
v.
SONOTONE CORP. ET AL.
No. 78-690.
Supreme Court of United States.
Argued April 25, 1979.
Decided June 11, 1979.
CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT.
*331 John E. Thomas argued the cause and filed a brief for petitioner.
Julian R. Wilheim and Elliot S. Kaplan argued the cause for respondents. With them on the brief were Fred L. Woodworth, Joseph C. Basta, and Deborah J. Palmer.
Assistant Attorney General Shenefield argued the cause for the United States as amicus curiae urging reversal. With him on the brief were Solicitor General McCree, Deputy Solicitor General Easterbrook, Stephen M. Shapiro, Barry Grossman, and Bruce E. Fein. Warren Spannaus, Attorney General *332 of Minnesota, argued the cause for the States of Alabama et al. as amici curiae urging reversal. With him on the brief were Richard B. Allyn, Solicitor General of Minnesota, Alan H. Maclin, Stephen P. Kilgruff, and Thomas Kenyon, Special Assistant Attorneys General; and John Ashcroft, Attorney General of Missouri, Walter O. Theiss, Assistant Attorney General, and Roger Bern; joined by other officials for their respective States as follows: Charles A. Graddick, Attorney General, for Alabama; Avrum M. Gross, Attorney General, and Mark E. Ashburn, Assistant Attorney General, for Alaska; Robert K. Corbin, Attorney General, and Kenneth R. Reed for Arizona; Steve Clark, Attorney General, and Royce O. Griffin, Jr., Deputy Attorney General, for Arkansas; George Deukmejian, Attorney General, Warren J. Abbott, Assistant Attorney General, and Linda L. Tedeschi, Deputy Attorney General, for California; J. D. MacFarlane, Attorney General, B. Lawrence Theis, First Assistant Attorney General, and William E. Walters, Assistant Attorney General, for Colorado; Carl R. Ajello, Attorney General, Gerard J. Dowling and Larry H. Evans, Assistant Attorneys General, for Connecticut; Richard S. Gebelein, Attorney General, and William E. Kirk III, Assistant Attorney General, for Delaware; Jim Smith, Attorney General, Charles R. Ranson, Special Assistant Attorney General, and Douglas C. Kearney, Assistant Attorney General, for Florida; Wayne Minami, Attorney General, and Thomas T. Wood, Deputy Attorney General, for Hawaii; David H. Leroy, Attorney General, and Mike Brassey, Deputy Attorney General, for Idaho; William J. Scott, Attorney General, for Illinois; Theodore L. Sendak, Attorney General, for Indiana; Thomas J. Miller, Attorney General, and Gary H. Swanson, Assistant Attorney General, for Iowa; Robert T. Stephan, Attorney General, and Wayne E. Hundley, Deputy Attorney General, for Kansas; Robert F. Stephens, Attorney General, and James M. Ringo, Assistant *333 Attorney General, for Kentucky; William J. Guste, Jr., Attorney General, and John R. Flowers, Jr., Assistant Attorney General, for Louisiana; Richard S. Cohen, Attorney General, and Cheryl Harrington, Assistant Attorney General, for Maine; Stephen H. Sachs, Attorney General, and Charles O. Monk II, Assistant Attorney General, for Maryland; Francis X. Bellotti, Attorney General, Paula W. Gold, Assistant Attorney General, and Steven J. Greenfogel for Massachusetts; Frank J. Kelley, Attorney General, and Edwin M. Bladen, Assistant Attorney General, for Michigan; A. F. Summer, Attorney General, and Marshall G. Bennett, Assistant Attorney General, for Mississippi; Mike T. Greely, Attorney General, and Jerome J. Cate, Assistant Attorney General, for Montana; Paul L. Douglas, Attorney General, and Robert F. Bartle and Paul E. Hofmeister, Assistant Attorneys General, for Nebraska; Richard H. Bryan, Attorney General, for Nevada; Thomas D. Rath, Attorney General, for New Hampshire; John J. Degnan, Attorney General, and Alfred J. Luciani for New Jersey; Jeff Bingham, Attorney General, and James J. Wechsler, Assistant Attorney General, for New Mexico; Robert Abrams, Attorney General, and John M. Desiderio, Assistant Attorney General, for New York; Rufus L. Edmisten, Attorney General, Howard A. Kramer, Deputy Attorney General, and David S. Crump, Special Deputy Attorney General, for North Carolina; Allen I. Olson, Attorney General, and Dale V. Sandstrom and Terry L. Adkins, Assistant Attorneys General, for North Dakota; William J. Brown, Attorneys General, and Eugene F. McShane and Richard M. Firestone, Assistant Attorneys General, for Ohio; Jan Eric Cartwright, Attorney General, and Manville J. Buford, Assistant Attorney General, for Oklahoma; James A. Redden, Attorney General, and James Kirkham Johns for Oregon; Edward G. Biester, Jr., Attorney General, and Norman J. Watkins and John L. Shearburn, Deputy Attorneys General, *334 for Pennsylvania; Dennis J. Roberts II, Attorney General, and Patrick J. Quinlan, Special Assistant Attorney General, for Rhode Island; Daniel R. McLeod, Attorney General, for South Carolina; Mark V. Meierhenry, Attorney General, and James E. McMahon, Assistant Attorney General, for South Dakota; William M. Leech, Jr., Attorney General, and William J. Haynes, Jr., Deputy Attorney General, for Tennessee; Mark White, Attorney General, for Texas; Robert B. Hansen, Attorney General, and Andrew W. Buffmire, Assistant Attorney General, for Utah; M. Jerome Diamond, Attorney General, and Jay I. Ashman, Assistant Attorney General, for Vermont; Marshall Coleman, Attorney General, and Joseph W. Kaestner, Assistant Attorney General, for Virginia; Slade Gorton, Attorney General, Thomas L. Boeder, Senior Assistant Attorney General, and Earle J. Hereford, Jr., Assistant Attorney General, for Washington; Chauncey H. Browning, Jr., Attorney General, and Charles G. Brown, Deputy Attorney General, for West Virginia; Bronson C. La Follette, Attorney General, and Michael L. Zaleski, Assistant Attorney General, for Wisconsin; and John D. Troughton, Attorney General, Peter J. Mulvaney, Deputy Attorney General, and James W. Gusea, Assistant Attorney General, for Wyoming.[*]
MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.
We granted certiorari to decide whether consumers who pay a higher price for goods purchased for personal use as a result of antitrust violations sustain an injury in their "business or property" within the meaning of § 4 of the Clayton Act, 38 Stat. 731, 15 U. S. C. § 15.

*335 I
Petitioner brought a class action on behalf of herself and all persons in the United States who purchased hearing aids manufactured by five corporations, respondents here. Her complaint alleges that respondents have committed a variety of antitrust violations, including vertical and horizontal price fixing.[1] Because of these violations, the complaint alleges, petitioner and the class of persons she seeks to represent have been forced to pay illegally fixed higher prices for the hearing aids and related services they purchased from respondents' retail dealers. Treble damages and injunctive relief are sought under §§ 4 and 16 of the Clayton Act, 38 Stat. 731, 737, as amended, 15 U. S. C. §§ 15 and 26.
Respondents moved for dismissal of the complaint or summary judgment in the District Court. Among other things, respondents argued that Reiter, as a retail purchaser of hearing aids for personal use, lacked standing to sue for treble damages under § 4 of the Clayton Act because she had not been injured in her "business or property" within the meaning of the Act.
The District Court held that under § 4 a retail purchaser is injured in "property" if the purchaser can show that antitrust violations caused an increase in the price paid for the article purchased. The District Court relied on Chattanooga Foundry & Pipe Works v. Atlanta, 203 U. S. 390, 396 (1906), and the legislative history of the Clayton Act set forth in Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U. S. 477, *336 486 n. 10 (1977), indicating that Congress intended to give a § 4 remedy to consumers. 435 F. Supp. 933, 935-938 (Minn. 1977).
The District Court determined, however, that the respondents had raised a "controlling question of law as to which there is substantial ground for difference of opinion." id., at 938, and accordingly certified the question for interlocutory review under 28 U. S. C. § 1292 (b). It then stayed further proceedings in the case and declined to express any opinion on the merits of the other issues raised by respondents' motions or on the certifiability of the class.
The Court of Appeals reversed, holding that retail purchasers of consumer goods and services who allege no injury of a commercial or business nature are not injured in their "business or property" within the meaning of § 4. 579 F. 2d 1077 (CA8 1978). Noting the absence of any holdings on this precise issue by this Court or other courts of appeals, the court reasoned that the phrase "business or property" was intended to limit standing to those engaged in commercial ventures. It relied on the legislative history and this Court's statement in Hawaii v. Standard Oil Co., 405 U. S. 251, 264 (1972), that "business or property" referred to "commercial interests or enterprises." A contrary holding, the Court of Appeals observed, would add a substantial volume of litigation to the already strained dockets of the federal courts and could be used to exact unfair settlements from retail businesses. Small and medium-sized retailers would be especially hard hit by "gigantic consumer class actions," and granting standing to retail consumers might actually have an anticompetitive impact as a consequence. Accordingly, the Court of Appeals thought "it sensible as a matter of policy and compelled as a matter of law that consumers alleging no injury of a commercial or competitive nature are not injured in their property under section 4 of the Clayton Act." 579 F. 2d. at 1087.
*337 We granted certiorari, 439 U. S. 1065 (1979).[2] We reverse.[3]

II
As is true in every case involving the construction of a statute, our starting point must be the language employed by Congress. Section 4 of the Clayton Act, 38 Stat. 731, provides:
"Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States . . . without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U. S. C. § 15 (emphasis added).
On its face, § 4 contains little in the way of restrictive language. In Pfizer Inc. v. Government of India, 434 U. S. 308 (1978), we remarked:
"`The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices *338 by whomever they may be perpetrated.' Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U. S. 219, 236; cf. Perma Life Mufflers, Inc. v. International Parts Corp., 392 U. S. 134, 138-139. And the legislative history of the Sherman Act demonstrates that Congress used the phrase `any person' intending it to have its naturally broad and inclusive meaning. There was no mention in the floor debates of any more restrictive definition." Id., at 312.
Similarly here, the word "property" has a naturally broad and inclusive meaning. In its dictionary definitions and in common usage "property" comprehends anything of material value owned or possessed. See, e. g., Webster's Third New International Dictionary 1818 (1961). Money, of course, is a form of property.
Respondents protest that, if the reference to "property" in § 4 means "money," the term "business" then becomes superfluous, for every injury in one's business necessarily involves a pecuniary injury. They argue that if Congress wished to permit one who lost only money to bring suit under § 4, it would not have used the restrictive phrase "business or property"; rather, it would have employed more generic language akin to that of § 16, for example, which provides for injunctive relief against any "threatened loss or damage." 15 U. S. C. § 26. Congress plainly intended to exclude some category of injury in choosing the phrase "business or property" for § 4. Only a "commercial interest" gloss, they argue, both gives the phrase the restrictive significance intended for it and at the same time gives independent significance to the word "business" and the word "property." The argument of respondents is straightforward: the phrase "business or property" means "business activity or property related to one's business." Brief for Respondents 11 n. 7.
That strained construction would have us ignore the disjunctive "or" and rob the term "property" of its independent *339 and ordinary significance; moreover, it would convert the noun "business" into an adjective. In construing a statute we are obliged to give effect, if possible, to every word Congress used. United States v. Menasche, 348 U. S. 528, 538-539 (1955). Canons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings, unless the context dictates otherwise; here it does not. See FCC v. Pacifica Foundation, 438 U. S. 726, 739-740 (1978). Congress' use of the word "or" makes plain that "business" was not intended to modify "property," nor was "property" intended to modify "business."
When a commercial enterprise suffers a loss of money it suffers an injury in both its "business" and its "property." But neither term is rendered redundant by recognizing that a consumer not engaged in a "business" enterprise, but rather acquiring goods or services for personal use, is injured in "property" when the price of those goods or services is artificially inflated by reason of the anticompetitive conduct complained of. The phrase "business or property" also retains restrictive significance. It would, for example, exclude personal injuries suffered. E. g., Hamman v. United States, 267 F. Supp. 420, 432 (Mont. 1967). Congress must have intended to exclude some class of injuries by the phrase "business or property." But it taxes the ordinary meaning of common terms to argue, as respondents do, that a consumer's monetary injury arising directly out of a retail purchase is not comprehended by the natural and usual meaning of the phrase "business or property." We simply give the word "property" the independent significance to which it is entitled in this context. A consumer whose money has been diminished by reason of an antitrust violation has been injured "in his . . . property" within the meaning of § 4.
Indeed, this Court indicated as much in Chattanooga Foundry & Pipe Works v. Atlanta, 203 U. S. 390 (1960). There the city alleged that the anticompetitive conduct of the defendants *340 had caused the city to pay more for water pipes purchased for use in the city's water system. The defendants answered that the pecuniary injury resulting from the alleged overcharges did not injure the city in its "business or property" within the meaning of § 4. This Court, without relying on the fact that the city was engaged in a business enterprise, stated:
"The city was . . . injured in its property, at least, if not in its business of furnishing water, by being led to pay more than the worth of the pipe. A person whose property is diminished by a payment of money wrongfully induced is injured in his property." 203 U. S., at 396.
The holding of Chattanooga Foundry could well have been grounded on the undisputed fact that the city was engaged in the commercial enterprise of supplying water for a charge and, therefore, engaged in a business. It was not uncommon for both municipalities and private companies to own and operate competing waterworks at the turn of the century. In operating a municipal public utility, the city was in a real sense engaged in the "business of furnishing water" when it purchased the pipe to carry water from the city's reservoirs to its customers. Ibid.
Yet, the Court's holding in Chattanooga Foundry was deliberately grounded on the premise that the city had been injured in its "property"independent of any injury it had sustained in its "business of furnishing water"because the defendants' antitrust violation caused it to pay a higher price for the pipe than it otherwise would have paid. Ibid. Chattanooga Foundry therefore establishes that monetary injury, standing alone, may be injury in one's "property" within the meaning of § 4. Thus, the fact that petitioner Reiter was deprived of only money, albeit a modest amount, is no reason to conclude that she did not sustain a "property" injury.
Nor does her status as a "consumer" change the nature of *341 the injury she suffered or the intrinsic meaning of "property" in § 4. That consumers of retail goods and services have standing to sue under § 4 is implicit in our decision in Goldfarb v. Virginia State Bar, 421 U. S. 773, 780, 782 (1975). There we held that a bar association was subject to a treble-damages suit brought under § 4 by persons who sought legal services in connection with the purchase of a residence. Furthermore, we have often referred to "consumers" as parties entitled to seek damages under § 4 without intimating that consumers of goods and services purchased for personal rather than commercial use were in any way foreclosed by the statutory language from asserting an injury in their "property." E. g., Pfizer Inc. v. Government of India, 434 U. S., at 313-315; Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U. S., at 486 n. 10; Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U. S. 481, 494 (1968); Mandeville Island Farms v. American Crystal Sugar Co., 334 U. S. 219, 236 (1948).
Hawaii v. Standard Oil Co., 405 U. S. 251 (1972), is not to the contrary. There we held that injury to a state's total economy, for which the state sought redress in its parens patriae capacity, was not cognizable under § 4. It is true we noted that the words "business or property" refer to "commercial interests or enterprises," and reasoned that Hawaii could not recover on its claim for damage done to its "general economy" because such injury did not harm Hawaii's "commercial interests." 405 U. S., at 264.
However, the language of an opinion is not always to be parsed as though we were dealing with language of a statute. Use of the phrase "commercial interests or enterprises," read in context, in no sense suggests that only injuries to a business entity are within the ambit of § 4. Respondents ignore the Court's careful use of the disjunctive and the naturally broad meaning of the term "interests" in Hawaii v. Standard Oil Co., supra. The phrase "commercial interests" was used there as a generic reference to the interests of the *342 State of Hawaii as a party to a commercial transaction. This is apparent from Hawaii's explicit reaffirmance of the rule of Chattanooga Foundry and statement that, where injury to a state "occurs in its capacity as a consumer in the marketplace" through a "payment of money wrongfully induced." treble damages are recoverable by a state under the Clayton Act. Hawaii v. Standard Oil Co., supra, at 263 n. 14. A central premise of our holding in Hawaii was concern over duplicative recoveries. We noted that a "large and ultimately indeterminable part of the injury to the `general economy'" for which the State sued was "no more than a reflection of injuries to the `business or property' of consumers" for which, on a proper showing, they could recover in their own right. 405 U. S., at 263-264.
Consumers in the United States purchase at retail more than $1.2 trillion in goods and services annually. 1978 Economic Report of the President 257 (Table B-1). It is in the sound commercial interests of the retail purchasers of goods and services to obtain the lowest price possible within the framework of our competitive private enterprise system. The essence of the antitrust laws is to ensure fair price competition in an open market. Here, where petitioner alleges a wrongful deprivation of her money because the price of the hearing aid she bought was artificially inflated by reason of respondents' anticompetitive conduct, she has alleged an injury in her "property" under § 4.
Nothing in the legislative history of § 4 conflicts with our holding today. Many courts and commentators have observed that the respective legislative histories of § 4 of the Clayton Act and § 7 of the Sherman Act, its predecessor, shed no light on Congress' original understanding of the terms "business or property."[4] Nowhere in the legislative record *343 is specific reference made to the intended scope of those terms. Respondents engage in speculation in arguing that the substitution of the terms "business or property" for the broader language originally proposed by Senator Sherman[5] was clearly intended to exclude pecuniary injuries suffered by those who purchase goods and services at retail for personal use. None of the subsequent floor debates reflect any such intent. On the contrary, they suggest that Congress designed the Sherman Act as a "consumer welfare prescription." R. Bork, The Antitrust Paradox 66 (1978). Certainly the leading proponents of the legislation perceived the treble-damages remedy of what is now § 4 as a means of protecting consumers from overcharges resulting from price fixing. E. g., 21 Cong. Rec. 2457, 2460, 2558 (1890). Because Congress in 1890 rejected a proposal to allow a group of consumers to bring a collective action as a class, some legislators questioned whether individual consumers would be willing to bring actions for relatively small amounts. See, e. g., id., at 1767-1768, 2569, 2612, 3147-3148, 3150. At no time, however, was the right of a consumer to bring an action for damages questioned.[6]
In Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., supra, after examining the legislative history of § 4, we described the Sherman Act as "conceived of primarily as a remedy for `[t]he people of the United States as individuals,' especially consumers," and the treble-damages provision of the Clayton Act as "conceived primarily as `open[ing] the door of justice *344 to every man . . . and giv[ing] the injured party ample damages for the wrong suffered.'" 429 U. S., at 486 n. 10. Thus, to the extent that the legislative history is relevant, it supports our holding that a consumer deprived of money by reason of allegedly anticompetitive conduct is injured in "property" within the meaning of § 4.[7]
Respondents also argue that allowing class actions to be brought by retail consumers like the petitioner here will add a significant burden to the already crowded dockets of the federal courts. That may well be true but cannot be a controlling consideration here. We must take the statute as we find it. Congress created the treble-damages remedy of § 4 precisely for the purpose of encouraging private challenges to antitrust violations. These private suits provide a significant supplement to the limited resources available to the Department of Justice for enforcing the antitrust laws and deterring violations. Indeed, nearly 20 times as many private antitrust actions are currently pending in the federal courts as actions filed by the Department of Justice. Administrative Office of the United States Courts Ann. Rep. 101, Table 28 (1978). To be sure, these private suits impose a heavy litigation burden on the federal courts; it is the clear responsibility of Congress to provide the judicial resources necessary to execute its mandates.
Finally, respondents argue that the cost of defending consumer class actions will have a potentially ruinous effect on small businesses in particular and will ultimately be paid by *345 consumers in any event. These are not unimportant considerations, but they are policy considerations more properly addressed to Congress than to this Court. However accurate respondents' arguments may prove to beand they are not without substancethey cannot govern our reading of the plain language in § 4.
District courts must be especially alert to identify frivolous claims brought to extort nuisance settlements; they have broad power and discretion vested in them by Fed. Rule Civ. Proc. 23 with respect to matters involving the certification and management of potentially cumbersome or frivolous class actions. See generally Durham & Dibble, Certification: A Practical Device for Early Screening of Spurious Antitrust Litigation, 1978 B. Y. U. L. Rev. 299. Recognition of the plain meaning of the statutory language "business or property" need not result in administrative chaos, class-action harassment, or "windfall" settlements if the district courts exercise sound discretion and use the tools available.
The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.
Reversed and remanded.
MR. JUSTICE BRENNAN took no part in the decision of this case.
MR. JUSTICE REHNQUIST, concurring.
I join the Court's opinion and write separately only to point out that the concern expressed by the Court of Appeals that an interpretation of "business or property" in the manner in which the Court interprets it today would "add a substantial volume of litigation to the already strained dockets of the federal courts and could be used to exact unfair settlements from retail businesses," ante, at 336, is by no means an unfounded one. And pronouncements from this Court exhorting district courts to be "especially alert to identify frivolous *346 claims brought to extort nuisance settlements" will not be a complete solution for those courts which are actually on the firing line in this type of litigation. Ante, at 345. But I fully agree that we must take the statute as Congress wrote it, and I also fully agree with the Court's construction of the phrase "business or property." I think that the Court's observation, ante, at 343 n. 6, that "the treble-damages remedy of § 4 took on new practical significance for consumers with the advent of Fed. Rule Civ. Proc. 23" is a miracle of understatement; and in the absence of any jurisdictional limit, there is considerable doubt in my mind whether this type of action is indeed ultimately of primary benefit to consumers themselves, who may recover virtually no monetary damages, as opposed to the attorneys for the class, who stand to obtain handsome rewards for their services. Be that as it may, the problem, if there is one, is for Congress and not for the courts.
NOTES
[*] David Berger, H. Laddie Montague, Jr., Merrill G. Davidoff, Stanley J. Friedman, Frederick P. Furth, Thomas R. Fahrner, Aaron M. Fine, and Josef D. Cooper filed a brief for the plaintiffs in Kennedy Smith v. Toyota Motor Sales U. S. A. et al. as amici curiae urging reversal.
[1] Specifically, Reiter alleges that respondents violated §§ 1 and 2 of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. §§ 1 and 2, and § 3 of the Clayton Act, 38 Stat. 731, 15 U. S. C. § 14. She claims respondents restricted the territories, customers, and brands of hearing aids offered by their retail dealers, used the customer lists of their retail dealers for their own purposes, prohibited unauthorized retailers from dealing in or repairing their hearing aids, and conspired among themselves and with their retail dealers to fix the retail prices of the hearing aids.
[2] Differing views on this issue have been expressed by various courts. See, e. g., Reiter v. Sonotone Corp., 579 F. 2d 1077 (CA8 1978) (case below); Bravman v. Bassett Furniture Industries, 552 F. 2d 90, 98-99, and n. 23 (CA3), cert. denied, 434 U. S. 823 (1977); Cleary v. Chalk, 159 U. S. App. D. C. 415, 419 n. 17, 488 F. 2d 1315, 1319 n. 17 (1973), cert. denied, 416 U. S. 938 (1974); Theophil v. Sheller-Globe Corp., 446 F. Supp. 131 (EDNY 1978); Gutierrez v. E. & J. Gallo Winery Co., 425 F. Supp. 1221 (ND Cal. 1977), appeal docketed, No. 77-1725 (CA9).
[3] The Court of Appeals expressly noted that Reiter's claim for injunctive relief under § 16 of the Clayton Act was not before it on interlocutory appeal. 579 F. 2d, at 1087 n. 19. The court therefore expressed no view as to Reiter's standing to raise this claim. It also expressly refused to decide whether Reiter's claim for treble damages under § 4 was barred by the direct-purchaser rule of Illinois Brick Co. v. Illinois, 431 U. S. 720 (1977). 579 F. 2d, at 1079 n. 3. Accordingly, these issues are not before us.
[4] See, e. g., Hawaii v. Standard Oil Co., 405 U. S. 251, 261 (1972); Weinberg v. Federated Department Stores, Inc., 426 F. Supp. 880, 882-883 (ND Cal. 1977), appeal docketed, No. 77-1547 (CA9); M. Forkosch, Antitrust and the Consumer 2-3 (1956); Comment, Closing the Door on Consumer Antitrust Standing, 54 N. Y. U. L. Rev. 237, 242-243, 249-252 (1979). See also 1 P. Areeda & D. Turner, Antitrust Law ¶ 106, pp. 14-16 (1978).
[5] As originally introduced, the bill that ultimately became the Sherman Act authorized "any person or corporation injured or damnified by [an unlawful] arrangement, contract, agreement, trust, or combination" to sue for damages thereby sustained. S. 1, 51st Cong., 1st Sess., § 2 (1889).
[6] Of course, the treble-damages remedy of § 4 took on new practical significance for consumers with the advent of Fed. Rule Civ. Proc. 23.
[7] Although in no sense a controlling consideration, we note that our holding is consistent with the assumption on which Congress enacted the Hart-Scott-Rodino Antitrust Improvements Act of 1976, 90 Stat. 1394, 15 U. S. C. § 15c et seq. The text and legislative history of this statute make clear that in 1976 Congress believed that consumers have a cause of action under § 4, which the statute authorizes the states to assert in a parens patriae capacity. See, e. g., 15 U. S. C. §§ 15c (a) (1), 15c (a) (1) (B) (ii), 15c (b) (2); H. R. Rep. No. 94-499, pp. 6, 9 (1975). See also Illinois Brick Co. v. Illinois, 431 U. S., at 734 n. 14.